IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SARAH LASTER                                                      PLAINTIFF

VS.                                    CIVIL NO. 05-2159

MICHAEL J. ASTRUE[1],
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                     DEFENDANT

## MEMORANDUM OPINION

     Sarah Laster ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of

the Social Security Administration denying her applications for childhood disability benefits

("CDB") and supplemental security income ("SSI") benefits under Title XVI of the Act.

## Background:

     The applications for CDB and SSI now before this court were protectively filed on May 1,

2003, alleging an onset date of July 27, 2001, due to a back disorder with associated pain in her back

and neck, panic attacks, and asthma.[2]  (Tr. 14, 66, 311-313, 347-348).  An administrative hearing

was held on November 2, 2004.  (Tr. 329-332).

     At the time of the administrative hearing, plaintiff was twenty-one years old and possessed

a tenth grade education.  (Tr. 14).  The record reveals that she has no past relevant work ("PRW")

experience.  (Tr. 14).

---

[1] Michael J. Astrue became the Social Security Commissioner on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

[2] Plaintiff had previously received dependent child benefits based on the record of her deceased father. (Tr. 13).  Her benefits ceased in July 2001, when she attained the age of 18.  (Tr. 13).

The Administrative Law Judge ("ALJ") rendered an unfavorable decision on June 21, 2005. (Tr. 13-25).  He concluded that plaintiff's impairments were severe but determined that they did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. The ALJ then found that plaintiff retained the residual functional capacity ("RFC") to perform a significant range of sedentary work with the ability to lift, carry, push, and pull ten pounds occasionally and five pound frequently; stand, and/or walk up to two hours per eight-hour day; sit up to six hours during an eight-hour day; and, occasionally bend, squat, crouch, climb stairs, and stoop.  (Tr. 24).  Further, due to mental limitations, the ALJ also concluded that plaintiff was limited to performing work where the interpersonal contact required is incidental to the work performed; the complexity of the tasks is learned and performed by rote with few variables and little judgment; and, the supervision required is simple, direct, and concrete.  With the assistance of a vocational expert, the ALJ found that plaintiff could perform work as an assembler, an industrial machine operator, a surveillance system monitor, and a production inspector.  (Tr. 24).

On September 16, 2005, the Appeals Council denied plaintiff's request for review.  (Tr. 3-5). Subsequently, plaintiff filed this action.  (Doc. # 1). This case is before the undersigned by consent of the parties.  Although both parties were afforded the opportunity to file appeal briefs, plaintiff chose not to do so.  (Doc. # 14).  As such, the case is now ready for decision.

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

2

2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

In order to qualify for CDB benefits, plaintiff must,

1.  Be the child of a worker entitled to a retirement or disability insurance benefit, or who died fully or currently insured, and
2.  Be a dependent of the insured, and
3.  Have filed an application for child's benefits, and
4.  Be unmarried, and
5.  Be under the age of eighteen, or
6.  If age eighteen or over, be under a disability which began before the child reached age twenty-two.

*See* 42 U.S.C.A. § 402(d)(1)(b); 20 C.F.R. § 404.350(a). In the present case, plaintiff was eighteen years of age on her alleged onset date. Therefore, she must show that she was under a disability which began before she reached the age of twenty-two. To do so, plaintiff must meet the same burden of proof as is required of an adult applying for disability benefits.

3

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

4

**Evidence Presented:**

From May 1984 until May 1996, plaintiff was hospitalized for asthma symptoms on several occasions. (Tr. 15, 252, 254-261, 268, 270-272, 283-288, 296-297). More recent medical records reveal that she does take asthma medication and that her symptoms are controllable with medication. (Tr. 15, 149-153, 159, 163, 165, 225, 230, 302-303). Further, plaintiff also reportedly smokes one package of cigarettes per day. (Tr. 15, 159, 174, 226, 231).

Records indicate that plaintiff also has a history of disruptive and oppositional behavioral issues. (Tr. 112, 254). Her behavior reportedly worsened in 1994, following the death of her biological father. In December 1996, she was admitted to the transitional unit at Harbor View due to dysthymia and oppositional defiant disorder. Plaintiff was placed on Zoloft but did not take it as prescribed because she did not feel she was in need of an anti-depressant. Therefore, it was discontinued. Plaintiff was discharged from Harbor View on January 6, 1997. (Tr. 112).

X-rays of plaintiff's lumbar spine dated February 12, 1996, revealed spina bifida occulta at the L5-S1 level; an anomalous formation of the L4 spinous process mimicking Baastrup's syndrome; an extremely hyperlordotic lumbar spine with an increased sacral base angle; minimal thoraco-lumbar dextroscoliosis; a wedge deformity of the T10, T11, and T12; and, a small cervical rib. (Tr. 157).

AO72A
(Rev. 8/82)

On November 3, 1997, Dr. James Aronson, the Chief Orthopaedic Surgeon with Arkansas Children's Hospital, diagnosed plaintiff with Scheuermann's kyphosis[3] with marked clinical deformity of the thoracic spine. (Tr. 207, 211, 215, 221). Dr. Aronson noted that plaintiff's spine was still growing, which afforded her the opportunity for some correction. (Tr. 207, 211, 216). She was fitted for a brace on November 13, 1997. (Tr. 211, 214). Initially, x-rays revealed improvement of the thoracic kyphosis and stable lumbar lordosis following placement of the brace. (Tr. 214).

On December 22, 1997, x-rays revealed that the curvature of plaintiff's spine had worsened. (Tr. 208). Therefore, Dr. Aronson sent plaintiff for brace adjustments and the addition of cross shoulder straps. (Tr. 208).

A progress note dated March 9, 1998, indicates that plaintiff refused to wear her brace and cross straps as prescribed. (Tr. 205, 208). At the hearing, plaintiff also testified that she did not wear the brace as prescribed. (Tr. 334).

Plaintiff was treated for substance abuse in August 2000 at the Horizon Treatment Program after testing positive for drugs while on probation.[4] (Tr. 109-110, 112, 115-116). Notably, plaintiff denied any problems with depression or anxiety and scored within the normal mood range on the Beck Depression Inventory. (Tr. 110, 112, 116). She was discharged on September 11, 2000, due to her failure to show improvement and comply with treatment, with the following diagnoses:

---

[3]Dr. stated that Scheuermann's kyphosis was a condition involving abnormal growth of the vertebrae causing them to become wedged anteriorly and producing severe kyphosis. (Tr. 207). He noted that this was often associated with very mild scoliosis. (Tr. 207).

[4]Plaintiff was placed on probation for truancy. (Tr. 109). However, her criminal history includes prior arrests for terroristic threat and fleeing from police. (Tr. 115).

6

oppositional defiant disorder; parent/child relational problems; cannabis dependence; alcohol abuse; anxiety disorder, not otherwise specified; rule out depressive disorder. (Tr. 110-111). Records indicate that she had a Global Assessment Functioning (GAF) score of 40, indicating a major impairment. It is also noted that plaintiff denied any issues regarding chemical dependency throughout her treatment. (Tr. 110).

As part of her probation terms, plaintiff began individual therapy at Vista Health on September 19, 2000, and attended at least monthly sessions until May 17, 2001. (Tr. 119-147). While in treatment, plaintiff passed all of her drug screens. (Tr. 123-124, 129, 132). The records indicate that upon discharge from Vista Health, no further treatment was recommended because she had improved. (Tr. 119-120). Her diagnosis was adjustment disorder with mixed disturbance of emotion and conduct, and she was assessed with a GAF score of 65, indicating only mild symptoms. (Tr. 119). There are no treatment records after May 2001.

On July 8, 2002, plaintiff was again treated for lower back and right hip pain. (Tr. 152). At this time, she was prescribed Vioxx. (Tr. 152).

On December 28, 2002, plaintiff was treated for an injury to her right leg. (Tr. 149). She was noted to be taking Singulair and a Maxair Inhaler for asthma. The doctor gave her samples of Vioxx to treat her leg pain. (Tr. 149).

On June 11, 2003, plaintiff sought chiropractic treatment. (Tr. 154-156). Records reveal that plaintiff complained of spinal pain. Dr. Larry Engelhoven noted kyphotic appearances in the thoracic and lumbar spine, along with a scoliotic appearance in the lumbar spine. After reviewing

7

her previous x-rays, he diagnosed plaintiff with lower back pain, congenital anomalies of the spine, and kyphoscoliosis and scoliosis. (Tr. 154-156).

On June 24, 2003, Dr. Patricia Walz, a psychologis, performed a consultative mental status examination of plaintiff. (Tr. 158-162). Plaintiff reported no problems with memory, concentration, or depression but did report a history of anxiety attacks. However, she indicated that her last anxiety attack was approximately one year prior. (Tr. 158-160). Dr. Walz found no limitations regarding plaintiff's ability to communicate and no impairment in her concentration, persistence, or pace. (Tr. 161). Socially, plaintiff stated that she had friends and lived with her boyfriend. (Tr. 161). She also reported that she did not need assistance with her activities of daily living. (Tr. 161). Dr. Walz assessed plaintiff with a history of drug and alcohol abuse, reportedly in remission; a history of depression and panic disorder, reportedly in remission; and, personality disorder with borderline and dependent traits. (Tr. 161). Although plaintiff's I.Q. was estimated to fall within the low average range, Dr. Walz could not identify two or more areas with significant limitations in adaptive functioning. (Tr. 160-161). The doctor did, however, suspect that plaintiff had under reported her drug and alcohol use and might have been under the influence of alcohol during the evaluation. (Tr. 159, 161). She indicated that plaintiff appeared to have very little frustration tolerance and was quite dependent with very limited coping skills. (Tr. 162).

On June 30, 2003, plaintiff underwent a general physical exam with Dr. Stephen Carney. Plaintiff reported some occasional lightheadedness, dyspnea associated with asthma, rib pain, anxiety, and depression. (Tr. 163-165). The examination revealed a full range of motion in

plaintiff's cervical and lumbar spine, as well as her extremities. (Tr. 166). No muscle spasms, muscle weakness, muscle atrophy, or sensory abnormalities were noted. (Tr. 167). Plaintiff's straight-leg raise test, gait, coordination, and limb function were all normal. (Tr. 166-167). As such, Dr. Carney diagnosed plaintiff with anxiety and kyphoscoliosis. (Tr. 169). Although he found her to be somewhat limited in her ability to carry and lift due to her back pain, he determined that she could do "some physical labor." (Tr. 169).

On July 10, 2003, plaintiff was treated for three self inflicted lacerations to her left forearm. (Tr. 172, 237-240). She denied suicidal or homicidal ideation, stating that she had cut herself in a fit of frustration. Plaintiff was reportedly upset with her boyfriend. One of plaintiff's lacerations required sutures. She was given an injection of Rocephin and a prescription for Keflex. (Tr. 172). The sutures were removed on July 27, 2003. (Tr. 230-234).

On August 16, 2003, plaintiff was seen in the emergency room with complaints of neck and back pain. (Tr. 170, 225-228). An examination revealed pain with range of motion in the cervical and lumbar spine. (Tr. 170). There was a very obvious curvature of the thoracic area and kyphosis of the lumbar area but no palpable spasm. However, some trigger point trapezius muscle tenderness was noted. She was given injections of Toradol and Norflex and prescriptions for Naprosyn and Flexeril. (Tr. 170, 228).

In an "Attending Physician's Statement" dated March 28, 2004, Dr. McClellan indicated that he had treated plaintiff for anxiety and asthma since August 1999.[5] (Tr. 303). He concluded that

---

[5]However, the record contains only two treatment records from Dr. McClellan for gastroenteritis. (Tr. 151, 153, 302-303, 328-329).

plaintiff could stand and walk for a total of three hours during an eight-hour workday and stand and walk for 30 minutes at a time before switching positions.  (Tr. 303).  Dr. McClellan opined that plaintiff would be absent from work as a result of her impairments or treatment about four days a month, and that she would sometimes need to take unscheduled rest breaks during an eight-hour shift.  (Tr. 302-303).

On February 16, 2005, Dr. Robert C. Thompson, an orthopedist, examined plaintiff.  (Tr. 304-306).  She reported chronic pain in the posterior and lower portions of the chest in an area known as the kyphotic change.  (Tr. 304).  A physical exam revealed a decreased range of motion in her lumbar spine but a normal range of motion in her upper extremities and cervical spine.  (Tr. 304, 306).  A neurological examination of her upper and lower extremities was normal.  (Tr. 304).  X-rays of her lumbar spine revealed Scheuermann's disease, old, with accentuated lower thoracic kyphosis and accentuated lumbar lordosis.  (Tr. 305).  Cervical ribs and altered thoracic configuration were also noted.  Dr. Thompson diagnosed her with mostly congenital and developmental anomalies of the spine with stiffness in the lumbar spine area.  (Tr. 304).

Dr. Thompson, also completed a Medical Assessment of Ability To Do Work-Related Activities.  (Tr. 304-309).  Dr. Thompson opined that plaintiff could lift/carry 10 pounds occasionally and 2-5 pounds frequently; stand/walk two to three hours total in an eight-hour workday; stand/walk thirty minutes to one hour without interruption; and was unlimited in her ability to sit.  (Tr. 307).  He also opined that she should never climb, balance, stoop, crouch, kneel, crawl, and should never work around heights or moving machinery.  (Tr. 308-309).

10

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  *Id*.  As the United States Court of Appeals for the Eighth Circuit  recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible.  The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record currently before the court reveals that plaintiff suffers from congenital and developmental anomalies of the spine.  We note, however, that, during the relevant time period, plaintiff has failed to seek consistent medical treatment regarding this impairment.  *See id.* (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).  Records indicate that plaintiff was prescribed a back

11

brace with cross shoulder straps in late 1997. (Tr. 211-221). The evidence shows, and plaintiff's testimony attests to the fact that, plaintiff failed to wear the brace as prescribed. (Tr. 205, 208, 334). *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). She did not seek treatment for this condition again until July 8, 2002. (Tr. 152). Then, on June 11, 2003, plaintiff consulted with a chiropractor. (Tr. 154-156). She next sought treatment for neck and back pain on August 16, 2003, at which time she was given prescriptions for pain medications. (Tr. 170, 228). The record contains no further evidence to show that plaintiff sought treatment for pain or symptoms related to this impairment.

Although plaintiff was prescribed pain medication in June 2002 and August 2003, at the time of the hearing, plaintiff testified to taking only over-the-counter pain medications. (Tr. 105, 329). *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain); *Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (infrequent use of prescription drugs supports discrediting complaints). We also note that plaintiff was only prescribed conservative treatment to correct this condition. *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints). No surgical intervention was recommended. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (discounting the claimant's allegations of disabling pain based on the conservative nature of his treatment, which included exercises, a back brace, and medication, but never surgery). Therefore, we cannot say that plaintiff's back impairment is as limiting as alleged.

12

While the record does reveal that plaintiff also suffers from asthma, she has not experienced a recent exacerbation of this condition. In fact, she was last treated for this condition in 1996. The record reveals no emergency treatment for asthma or any related conditions during the relevant time period. Plaintiff has been prescribed medication to treat this condition and, according to her treating doctor, she has responded well to the medication. (Tr. 303). *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). We also note that, in spite of her asthma, plaintiff has continued to smoke cigarettes. Further, there is no evidence that her pulmonary function is significantly compromised and no physician has ever restricted her daily activities because of her pulmonary status. *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). Accordingly, we find substantial evidence to support the ALJ's finding that this is a non-severe impairment.

The record also reveals that plaintiff has a history of substance abuse, anxiety disorder, and behavioral problems. Prior to the relevant time period, records show that plaintiff was diagnosed with disruptive and oppositional behavior. (Tr. 112, 254). She received inpatient treatment for substance abuse, oppositional defiant disorder, and anxiety disorder in September 2000. (Tr. 109-116). Further, plaintiff underwent individual therapy on an outpatient basis from September 19, 2000, until May 17, 2001. The records indicate that plaintiff's discharge diagnosis was adjustment disorder with mixed disturbances of emotion. At that time, she was said to have had a GAF score of 65.[6] There is, however, no further medical evidence to show that plaintiff sought treatment for

---

[6]A GAF of 61 to 70 indicates some mild symptoms (e.g. depressed mood or mild insomnia) or some difficulty in social, occupational, or school functioning (e.g. occasional

her substance abuse or anxiety.  *See Jones v. Callahan*, 122 F.3d 1148, 1153 (1997) (holding that ALJ properly concluded claimant's mental impairment was not severe where he was not undergoing regular mental health treatment or regularly taking psychiatric medications).  In fact, her treating doctor indicated that plaintiff's anxiety could be controlled via medication.  (Tr. 303).  *See Roth*, 45 F.3d at 282.  Accordingly, we cannot say that plaintiff's mental impairments are disabling.

The record does reveal that plaintiff was treated for self-inflicted lacerations to her arm in July 2003.  (Tr. 172, 237-240).  At this time, plaintiff denied suicidal or homicidal ideations.  Instead, she indicated that she had injured herself in a fit of rage against her boyfriend.  There is, however, no further evidence to indicate that plaintiff was treated for behavioral issues during the relevant time period.  *See Edwards*, 314 F.3d at  967.  As such, the evidence does not support a finding of disability based on this impairment.

Plaintiff also testified that she had recently been prescribed Hydroxyzine to treat her alleged anxiety.  (Tr. 333).  Although she did indicate that this medication had been prescribed by a Dr. Finley, she could not remember the name of his clinic.  (Tr. 333).  Further, there is nothing in the record to show that plaintiff was ever treated by this doctor or received a prescription for this medication.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

---

truancy, or theft within the household), but generally functions pretty well and has some meaningful interpersonal relationships.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV 34 (4th ed. Revised 2000).

14

Further, although plaintiff contends that she did not seek more consistent medical and mental health treatment due to her financial situation, the records show that, even when she was receiving her social security checks, from March 1998 until July 2001, she was not seeking treatment. (Tr. 18, 73, 92, 336-337).  In addition, there is no evidence to show that plaintiff has ever been refused medical care on the basis of a lack of resources, or that she has contacted any low-cost or charitable organizations in an effort to obtain medical care. *See Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992); *Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003).  It is also worth noting that plaintiff has chosen to spend her money on tobacco to support her smoking habit rather than on her health care, which discredits her allegations of debilitating symptoms.  (Tr. 159, 226, 231).  *See Wheeler v. Apfel*, 224 F.3d  891, 895 (8th Cir. 2000); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999).

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability.  In March 2001, plaintiff performed 50 hours of community service at the Salvation Army as part of her probation. (Tr. 19, 123-124, 130).  There is nothing in the record to suggest that she reported any difficulties in performing this service. (Tr. 19, 123-124, 130).  In May 2001, plaintiff stated that she had purchased a motorcycle and was learning to ride it. (Tr. 120).  Then, in June 2003, she indicted that she had been swimming, fishing, and playing the guitar. (Tr. 161).  Plaintiff also completed a disability questionnaire on May 14, 2003, on which she reported an ability to care for her personal grooming needs without assistance, engage in many household chores, run errands, prepare sandwiches and frozen dinners, count change, watch TV, listen to the radio, read, visit

AO72A
(Rev. 8/82)

friends/relatives, play the guitar, and draw.  (Tr. 75-76).  In December 2003, plaintiff completed a second questionnaire indicating that she could care for her personal hygiene, do the laundry, wash the dishes, prepare sandwiches and frozen dinners, watch TV, listen to the radio, play video games, and read.  (Tr. 88-89).  However, we can find no medical evidence to show that plaintiff's condition worsened between May 2003 and December 2003 to substantiate plaintiff's reported ability to perform fewer tasks.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Therefore, although it is clear that plaintiff suffers from some degree of pain, she has not established that she is unable to engage in any and all gainful activity.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability.  Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

16

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform a significant range of sedentary work.  It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.15459©, while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional.  *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, additional mental status evaluations, plaintiff's subjective complaints, and her medical records.  On July 15, 2003, Dr. Brad Williams, a non-examining psychologist, completed a mental RFC assessment.  (Tr. 186-203).  He diagnosed plaintiff with depression and anxiety by history, mixed personality disorder with dependent and borderline traits, and behavioral changes or physical changes associated with the regular use of substances.  As such, Dr. Williams concluded

17

that plaintiff had mild restrictions regarding activities of daily living and moderate restrictions in the areas of social functioning and concentration, persistence, or pace. (Tr. 196).  He also found plaintiff to have moderate limitations in her ability to understand, remember, and carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instruction and respond appropriately to criticism from supervisors; and, set realistic goals or make plans independently of others.  (Tr. 200-201).  However, no episodes of decompensation were noted.  (Tr. 196).  Dr. Williams stated that plaintiff would be able to perform work where the interpersonal contact required was incidental to the work perform, the complexity of the tasks performed was learned and performed by rote, the tasks required little judgment, and the supervision required was simple, direct, and concrete.  (Tr. 202).

On August 7, 2003, Dr. Robert Redd, a non-examining, medical consultant, completed a physical RFC assessment. (Tr. 184).  After reviewing plaintiff's medical records, he determined that plaintiff had a non-severe impairment.  (Tr. 184).  This assessment was affirmed by Dr. Susan Tigert on January 27, 2004. (Tr. 185).

We also note that Dr. Carney examined plaintiff in June 30, 2003, and reported a full range of motion in her spine and extremities with no muscle spasms, muscle weakness, muscle atrophy, or sensory abnormalities.  (Tr. 166-167).  Her straight-leg raise test, gait, coordination, and limb function were also said to be normal.  (Tr. 166-167).  As such, Dr. Carney concluded that plaintiff could still perform "some physical labor," in spite of her back impairment.  (Tr. 169).

Dr. Thompson, an orthopedist, also examined plaintiff on February 16, 2005, and found a decreased range of motion in plaintiff's lumbar spine but a normal range of motion in her upper extremities and cervical spine. (Tr. 304, 306). A neurological examination of her upper and lower extremities was normal. (Tr. 304). Following his examination, Dr. Thompson opined that plaintiff could lift/carry 10 pounds occasionally and 2-5 pounds frequently; stand/walk two to three hours total in an eight-hour workday; stand/walk thirty minutes to one hour without interruption; and was unlimited in her ability to sit. (Tr. 307). He also opined that she should never climb, balance, stoop, crouch, kneel, crawl, and should never work around heights or moving machinery. (Tr. 308-309).

Although Dr. McClellan, plaintiff's treating physician, did not voice an opinion concerning plaintiff's exertional limitations, he did state that plaintiff would be absent from work as a result of her impairments or treatment about four days a month, and that she would sometimes need to take unscheduled rest breaks during an eight-hour shift. (Tr. 302-303). We find, however, that the ALJ properly discounted Dr. McClellan's opinion because it is not supported by the medical evidence of record. Had plaintiff's condition been as limiting as alleged, we believe that she would have followed the prescribed treatment for her back and sought more consistent medical treatment. Therefore, we find substantial evidence to support the ALJ's conclusion that plaintiff could perform a significant range of sedentary work with the ability to lift, carry, push, and pull ten pounds occasionally and five pound frequently; stand, and/or walk up to two hours per eight-hour day; sit up to six hours during an eight-hour day; occasionally bend, squat, crouch, climb stairs, and stoop; and, perform work where the interpersonal contact required is incidental to the work performed, the

19

complexity of the tasks is learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete.

In addition, we find substantial evidence to support the ALJ's finding that plaintiff could perform work as an assembler, an industrial machine operator, a surveillance system monitor, and a production inspector. (Tr. 24). The ALJ asked the vocational expert to assume a hypothetical person of plaintiff's age and education who has no past relevant work and retains the RFC to lift and carry 10 pounds occasionally and 5 pounds frequently; push and pull within those same limitations; stand and walk for at least 2 hours; sit for up to six hours; occasionally bend, squat, crouch, climb, and stoop; and, perform work where the interpersonal contact required is incidental to the work performed, the complexity of the tasks is learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete. (Tr. 353-357). The vocational expert testified that a person with these limitations could still perform work as an assembler (with 260 jobs in the local economy, 2,000 jobs in Arkansas, and 140,000 in the national economy), an industrial machine operator (with 250 jobs in the local economy, 1,900 jobs in Arkansas, and 500,000 in the national economy), a surveillance system monitor (with 90 jobs in the local economy, 300 jobs in Arkansas, and 24,000 in the national economy), and a production inspector (with 30 jobs in the local economy, 200 jobs in Arkansas, and 14,000 in the national economy). (Tr. 355-357). *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could perform these positions.

AO72A
(Rev. 8/82)

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this <u>27th</u> day of March 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

21